

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**July 6, 2023 10:06**

By: Y TIMOTHY CHAI 0092202

Confirmation Nbr. 2900931

KINZIE ADVANCED POLYMERS LLC                    CV 23 981978

      vs.

HIGHHOPES LLC                    **Judge:**  WILLIAM T. MCGINTY

**Pages Filed:**  35

## IN THE COMMON PLEAS COURT
## CUYAHOGA COUNTY, OHIO

KINZIE ADVANCED POLYMERS LLC :
dba GROVE BAGS :
26201 Richmond Road, Unit D :
Bedford Heights, Ohio 44146 :
: CASE NO. _____
       Plaintiff :
:
v. : JUDGE _____
:
HIGHOPES, LLC :
14241 NE Woodinville Duval Road :
#372 : **(Jury Demand Endorsed Hereon)**
Woodinville, Washington 98072 :
:
       Defendant. :

## COMPLAINT AND JURY DEMAND

Plaintiff Kinzie Advanced Polymers LLC d/b/a Grove Bags ("Plaintiff") for its Complaint and Jury Demand (the "Complaint") against Defendant Highopes, LLC ("Defendant") avers and states as follows:

## THE PARTIES

1. Plaintiff is an Ohio limited liability company.

2. Plaintiff's principal place of business is located in Cuyahoga County at 26201 Richmond Road, Unit D, Bedford Heights, Ohio 44146.

3. Plaintiff created TerpLoc®, a cannabis film that is the first of its kind.

4. Plaintiff is a leader in the cannabis industry with valuable contacts with all levels of the supply chain from growers to retailers.

5. Defendant is a service provider that touts itself as a cannabis industry specialist: "Welcome to HIGHOPES, a top branding agency for cannabis websites, dispensary design, cannabis marketing and more.

6.     This lawsuit arises out of services provided by Defendant to Plaintiff that failed to live up to the specific terms promised by Defendant.

7.     Prior to filing this lawsuit, Plaintiff met and conferred with Defendant's counsel, but Defendant was unwilling to negotiate in good faith to remedy Defendant's mistakes, errors, and delays.

8.     Defendant's unwillingness to negotiate in good faith is a further breach of the Parties' contract.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over Defendant because Defendant knowingly contracted with an Ohio business.

10.     This Court also has personal jurisdiction because Defendant performed services on Defendant's website that is based and managed in Cuyahoga County, Ohio.

11.     Prior to filing this lawsuit, Plaintiff attempted to negotiate a resolution of the damage caused by Defendant, but Defendant was unwilling to negotiate in good faith.

12.     This Court is the proper venue for this matter because some or all of the conduct giving rise to this Lawsuit occurred in Cuyahoga County and the claim for relief arose in Cuyahoga County.

## FACTS COMMON TO ALL CLAIMS

13.     Plaintiff is a leader in the cannabis industry with valuable contacts with all levels of the supply chain from growers to retailers.

14.     Plaintiff's online business was strong, but it sought to improve its website and branding through a third party in 2022.

15.     Plaintiff was seeking to (1) design and develop a scalable and conversion optimized e-commerce website; and (2) begin utilizing SEO marketing to regain and exceed past search rankings.

16.     In simple terms, Plaintiff was seeking to increase outreach and to better compete in the digital space.

17.     Many companies provide such products and services.

18.     Defendant represented itself as the expert in these areas for the cannabis industry.

19.     Defendant represented that it not only had the expertise to provide these services, but also specific knowledge of the cannabis industry that would be of great value to Plaintiff.

20.     Defendant represented that it had the manpower to timely complete Plaintiff's services.

21.     Defendant represented that it could timely complete Plaintiff's project.

22.     Time and quality were of the utmost importance to Plaintiff due to the fact that it had an existing e-commerce platform and it did not want to damage its existing platform during the upgrade.

23.     In addition, Plaintiff is a lean and fast growing company that did not have the extra manpower to supplement the web provider's services.

24.     Plaintiff and Defendant ultimately entered into a Project Proposal.

25.     Plaintiff only entered into the Project Proposal based on Defendant's representations as to its capabilities.

26.     Plaintiff learned that Defendant's material representations were false.

27.     Upon information and belief, Defendant was aware that it could not timely and effectively complete the project when the proposal was submitted to Plaintiff.

28.    A true and correct copy of the Project Proposal is attached hereto as Exhibit 1.

29.    A material term of the Project Proposal was the completion of the planning, design and implementation in a time period of 9-12 weeks.

30.    Defendant failed to meet the timeframes set forth in the Project Proposal.

31.    More importantly, Defendant did not have the manpower or expertise to complete the project without significant involvement from Plaintiff.

32.    Plaintiff had to utilize a substantial amount of executive employee man hours in order to complete the project.

33.    Due to the delays to the project and Defendant's poor work, Plaintiff suffered a loss of e-commerce sales.

34.    Plaintiff notified Defendant of the damages caused by Plaintiff's breach of the contract.

35.    Defendant, however, was not willing to discuss a good faith resolution of the breach.

36.    Defendant did not deny that it breached the contract, but it sought to force Plaintiff to provide significant documentation before Defendant would provide compensation to Plaintiff.

37.    The contract required a good faith negotiation of the dispute prior to filing a lawsuit.

38.    Defendant did not negotiate in good faith.

39.    Plaintiff ultimately filed this lawsuit due to the damages caused by Defendant's breach of the contract and significant misrepresentations.

40.    Defendant has breached the contract.

41.    Defendant has knowingly misrepresented its capabilities.

42.     Defendant's actions have resulted in damages to Plaintiff in excess of Twenty-Five Thousand Dollars.

## COUNT I – BREACH OF CONTRACT

43.     Plaintiff incorporates paragraphs 1 through 42 of the Complaint as if fully rewritten.

44.     The Parties entered into a contract for Defendant's services.

45.     The contract required Defendant to timely and effectively complete the project.

46.     Plaintiff has fully complied with the contract.

47.     Defendant has breached the contract.

48.     Defendant's conduct has damaged Plaintiff.

49.     Following the breach, Plaintiff notified Defendant of the breach as required by the contract.

50.     The contract, drafted by Defendant, required the parties to negotiate to resolve the dispute.

51.     Defendant failed to negotiate in good faith.

52.     As a result of Defendant's breach of contract, Defendant owes an amount in excess of Twenty-Five Thousand Dollars, plus attorney fees, and Court costs.

## COUNT II – FRAUDULENT MISREPRESENTATIONS

53.     Plaintiff incorporates paragraphs 1 through 52 of the Complaint as if fully rewritten.

54.     Plaintiff had many options available to it for the e-commerce services that it sought.

55.     Plaintiff contracted with Defendant based on Defendant's representations regarding the quality of its services, its manpower, and its claimed knowledge of the cannabis industry.

56.     Defendant knowingly misrepresented its capabilities.

57.     Defendant knowingly induced Plaintiff to enter into the contract based on Defendant's misrepresentations.

58.     Plaintiff would not have entered into the contract but for Defendant's material misrepresentations.

59.     Plaintiff could not have discovered the falsity of Defendant's representations at the time of the contract.

60.     Defendant has caused significant harm to Plaintiff.

61.     Defendant's conduct was willful.

62.     Defendant's conduct was intentional.

63.     Defendant's conduct was malicious.

64.     Plaintiff is entitled to punitive damages.

65.     As a result of Defendant's intentional misconduct, Defendant owes Plaintiff an amount in excess of Twenty-Five Thousand Dollars, plus attorney fees, punitive damages, and Court costs.

WHEREFORE, Plaintiff demands judgment and relief against Defendant as follows:

1.      Damages in an amount of Thirty-Five Thousand Dollars, plus attorney fees, and Court costs for Defendant's breach of contract.

2.      Damages in an amount of Thirty-Five Thousand Dollars, plus attorney fees, punitive damages, and Court costs for Defendant's fraudulent misrepresentations;

3.      Interest on the amounts owed to Plaintiff;

4.      Costs incurred in prosecuting this action;

5.      Attorney fees incurred in prosecuting this matter on the breach of contract claim;

6.      Attorneys fees based on the award of punitive damages;

7.    Punitive damages; and

8.    Any other appropriate relief that this Court deems just and equitable.

Respectfully submitted,

*/s/ David A. Campbell*
David A. Campbell (0066494)
Y. Timothy Chai (0092202)
Lewis Brisbois Bisgaard & Smith, LLP
1375 E. 9th Street, Suite 2250
Cleveland, OH 44114
Phone: (216) 298-1262
Fax: (216) 344-9421
david.a.campbell@lewisbrisbois.com
Timothy.Chai@lewisbrisbois.com

*Attorneys for Plaintiff*

## JURY DEMAND

Pursuant to Rule 38(B) of the Ohio Rules of Civil Procedure, a trial by jury is respectfully requested on all the issues presented herein.

*/s/ David A. Campbell*
David A. Campbell (0066494)

*One of the Attorneys for Plaintiffs*



# HIGHOPES

**Project Proposal**

**Prepared For: Grove Bags**

**Delivered on: January 24, 2022, Revised February 4, 2022**

*Expires after 7 days*



PLAINTIFF'S
EXHIBIT
1
tabbies

# Overview and Goals

## Your Goals

1. Position Grove Bags as an elite B2B brand able to compete successfully with the competition digitally.

2. Restructure information hierarchies to best communicate to specific verticals within the market as to key differentiators.

3. Increase outreach and it's automation to garner increased sales and end-customer feedback.

4. Decrease workload for internal Website expansion, edits, and marketing integrations.

## Our Solutions

1. Design and develop a scalable & conversion optimized e-commerce website

2. Begin utilizing SEO marketing to regain and exceed past search rankings

**HIGHOPES**

Grove Bags | January 24, 2022



# Scope of Services

## Planning

Before we get started, it's critical to your project's success that we complete some initial discovery and planning to serve as the foundation for the rest of the process.

### PROCESS

- Pre-project questionnaire
- Kickoff Meeting
- Existing Asset Collection
- Client Dashboard & Timeline

## Website UX/UI Design

Before development begins, we will design the user experience and user interface of the website through a static mockup process.  After final approval, these mockups will be passed over to our development team.

### PROCESS

- 4 web page mockups
  - Home
  - All Products
  - Product Template
  - Cultivators

- Mockups produced in desktop format
- Up to three rounds of revisions before development begins

## Website Development



We will develop a multi-page website based on the following respective recommended sitemaps, features, and functionality with a single round of revision.

## PROCESS

- A multi-page e-commerce website
- Website Seminar and training for future onboarding
- Visual Framework license for future management

## SITEMAP

1. Home
2. Technology
3. Cultivators
4. Distributors
5. Dispensaries
6. Consumers
7. Custom Products
8. Savings Calculator
9. News
10. Contact (External Link)
11. Press
12. All Products
13. Product Categories (~13)
14. Product Page Template (~50)
15. Account
16. Checkout
17. Cart

## FEATURES & FUNCTIONALITY

***Speed Optimization***

We believe basic speed optimization should be included in every site we build.  This contributes to overall UX as well as (necessarily) your conversions and usability.  We've outlined our basic suggestions below:



1. CDN Integration (This ongoing service is free with our preferred hosting partner)
2. Caching Integration (This ongoing service is free with our preferred hosting partner)
3. Automated minification of HTML, JS, & CSS files (where applicable)
4. Asynchronous/delayed load of applicable javascript files

### Email Capture

Connection of your native forms to your email marketing platform to facilitate the capture of user information and segmentation of mailing lists.  We propose Mailchimp for a minimum viable product (MVP) as it provides a low-barrier entry as well as exporting capabilities.

### Woocommerce Setup

General setup of Woocommerce would include:

1. Plugin installation
2. Email automation setup
3. Email automation setup
4. Checkout validation setup
5. Account setup
6. Global cart setup

### Payment Gateway Integration

Our team will integrate your payment gateway into the website to facilitate the taking of payments. This integration is predicated on your payment gateway selection having a 1st or 3rd party solution for integration out of the box. Purchase of tertiary plugins will be the responsibility of your team.

### Shipping Option Integration

Shipping will be integrated in a similar fashion to existing shipping options via your woocommerce install.

### Tax Setup

Based on your shipping / selling location, we will facilitate the set of taxes by origin or customer location.

### CRM Integration



In order to help facilitate upselling opportunities, our team will integrate your current CRM as much as allowed within the process of Wocoomerce sales processes. Ideally, after identifying your CRM, we'd like to see the ability to pass custom packaging needs directly to sales as well as identify high-order sales.

### Geo-location Based Popups

Our team proposes building geo-location based messages depending on the country of origin to provide the opportunity to redirect directly the central hub distributors for their region.

## PLATFORM

### WordPress CMS

We suggest leveraging WordPress for the brand's content management system.  Key benefits are quick prototyping, client adoptions, and short deployment time.

### Visual Framework & Boilerplate

We suggest theming this website with a visual framework and a lightweight boilerplate theme for rapid development.  This will also allow your team to make simple layouts, pages, and elements without developer support.  We suggest the following:

*Visual Framework: Elementor*

*Boilerplate Theme: GeneratePress, Sage, or Underscores*

## Training

Included in this initial project will be a walkthrough of the backend of your website that will give you a basic introduction to WordPress and teach you to use the tools we've provided.  We'll cover the following topics:

- Basic website management
- Custom modules and plugins
- Email marketing integration
- Best practices for maintenance



After this process, we'll independently record a walkthrough using your questions to provide context for our video's focus.  These videos will be store on the backend of your website and can be downloaded independently for training as well.

Additionally, we will provide you with 1 month of web maintenance supports.  While we do test our websites extensively, this will ensure you have a safety net in case a bug does pop up.

## PROCESS

- Custom video to train you on the backend of your site
- 1 month of complimentary website warranty maintenance

# SEO+ Program

The SEO+ program is built to increase your organic rankings in the short and long term, providing a holistic process of setup, on-page SEO, and off-page SEO tactics. During this execution, we'll continue the process of increasing your organic rankings by distributing your information across different aggregators while simultaneously building more branded content around the strategies we identify within our research.

## DELIVERABLES

### SEO Setup

This is an annually executed strategy and looks at a number of SEO factors, including:

- Technical SEO Analysis
- Keyword Research
- Competitor Research (Keyword and Content-Based)
- General Website Content Recommendation for Improvements
- Write and Implement Title Tag & Meta Description
- Google My Business Listing
- Bing Business Listing
- Google Analytics - set up goal tracking for organic search

### SEO Network (Off-page SEO)



- Infogro
- Factual

Note: This aggregation process takes anywhere from 6 - 8 weeks for full propagation, after which directory listings sites may utilize this data to distribute this information via their networks.

**Blog Post Copywriting (On-page SEO)**

Our copywriters will complete 4 monthly posts to be scheduled by our internal team for publishing. These blog posts will be, on average, 500 words per post and be subject to a single round of revisions for each. Every month our team will begin concepting the next month's posts based on your keyword strategy, goals, and topic input. Before posts begin development, we will schedule a time to review the content strategy and receive approval

**Reporting**

In order to keep you apprised of updates, our team will provide monthly reports based on the progress of our efforts. These include

- SEO Network link distribution
- SEO Network rank tracking
- Organic traffic tracking
- Blog post engagement

## WebCare Program

Our WebCare program is a great solution for those looking for a hands-off experience when comes to their website maintenance and those who want consistent reporting on measure their own marketing efforts. With this program, you can expect to get peace of mind, reduce t possibility of future website issues, and receive automated reporting to track your digital marketing efforts.

## DELIVERABLES

**CMS Updates**

In order to maintain the health of your Wordpress installation, we make sure to update your install and track for issues on a monthly basis.

**Plugin / 3rd Party Updates**

**HIGHOPES**

Grove Bags | January 24, 2022

# WebCare Program

Our WebCare program is a great solution for those looking for a hands-off experience when comes to their website maintenance and those who want consistent reporting on measure their own marketing efforts. With this program, you can expect to get peace of mind, reduce t possibility of future website issues, and receive automated reporting to track your digital marketing efforts.

## DELIVERABLES

### CMS Updates

In order to maintain the health of your Wordpress installation, we make sure to update your install and track for issues on a monthly basis.

### Plugin / 3rd Party Updates

Similar to CMS updates, your plugins will be updated on a monthly basis via a staging environment. Updated plugins will only be moved to your live install after compatibility testing.

### Website Backup Management

Website backups will be integrated into your update workflow to ensure continual data recovery options. In the case backups are already integrated, we will manually create and manage those backups when necessary.

### Ongoing Speed Optimization Setup

Ongoing speed optimization will revolve around the setup of automated speed optimization services. This may involve the integration of image optimization tweaks, GZIP, caching, and minification.

### Basic Website Monitoring

Google Analytics to output custom reports when it detects your website is having issues. This lets us know when something needs to be fixed or further monitored.

### Google Analytics Reporting

Google Analytics reporting will center around your uniqueconversion goals, traffic sources, and monitoring. You willreceive these reports on a monthly basis.





# Project Investment

| Description | Subtotal |
|---|---|
| **Website UX/UI Design** | $4,000 |
| **Website Development** | $19,000 |
| **SEO+ Program**<br>*Month-to-month, 6 month minimum* | $2,000 / month |
| **Webcare Program**<br>*Month-to-month subscription* | $250 / month |
| Recurring total per month | $2,250 |
| Total | $19,000 |

# Timeframe

*To complete the work outlined in the project scope, we'll need approximately 9 - 12 weeks from beginning to end, depending on when we receive feedback at each milestone. Upon signing the proposal, we are prepared to kick off your project the week of February 14th\*:*

\*This is an anticipated start date and is dependent upon proposal signing and deposit payment at least 3 business days before the projected kickoff week.

| Deliverable | Timeframe (weeks) |
|---|---|
| Website UX/UI Design | 3 - 4 |
| Website Development | 6 - 8 |
| Total | 9 - 12 |

# Next Steps

1. Sign the Proposal
2. Pay the Project Deposit
3. Review the Project Questionnaire
4. We'll schedule a Project Kickoff Call

# Project Agreement

## PRICING BREAKDOWN

Recurring Total (billed monthly): $2,250.00

Total Project Cost: $23,000.00

## PAYMENT SCHEDULE

The total project cost will follow the schedule below. Full payment is due before the transfer of deliverables.

50%: Invoiced and paid upon execution of the Proposal by both parties

25%: due March 21, 2022

25%: due April 18, 2022

## RECURRING PAYMENT SCHEDULE

100% of any setup fees will be invoiced and paid upon execution of the Proposal by both parties. 100% of each subsequent month's payment will be due at the beginning of each month in which work is to be completed.

## SEO+ PROGRAM CANCELLATION

Good things take time. The SEO+ Program is a 6-month minimum commitment. Early termination will result in a $2,500 cancellation fee.

## TERMS

Please refer to the Basic Terms & Conditions for additional terms.  If there are any conflicting language or other elements between the Basic Terms & Conditions and this Proposal, the Proposal will govern.

*To accept this Proposal, click the Accept button and sign at the prompt. You will be emailed a copy for your records.*

*Patrick Toste*

*Jalen Bosker*
2022-02-08 13:09:44 (PST)

---

Patrick Toste

---

| Jalen Bosker |
| Grove Bags |



**HIGHOPES**

Grove Bags | January 24, 2022

# Basic Terms And Conditions

## 1 Definitions

### 1.1 Agreement

Agreement means the entire content of this Basic Terms and Conditions document, the Proposal document(s), Schedule A, together with any other Supplements designated below, together with any exhibits, schedules or attachments hereto.

### 1.2 Client Content

Client Content means all materials, information, factual, promotional, or other advertising claims, photography, writings and other creative content provided or required by Client for use in the preparation of and/or incorporation in the Deliverables.

### 1.3 Copyrights

Copyrights means the property rights in original works of authorship, expressed in a tangible medium of expression, as defined and enforceable under U.S. Copyright Law.

### 1.4 Deliverables

Deliverables means the services and work product specified in the Proposal to be delivered by HIGHOPES to Client, in the form and media specified in the Proposal.

### 1.5 HIGHOPES Tools

HIGHOPES Tools means all design tools developed and/or utilized by HIGHOPES in performing the Services, including without limitation pre-existing and newly developed software including source code, Web authoring tools, type fonts, and application tools, together with any other software, or other inventions whether or not patentable, and general non-copyrightable concepts such as Website design, architecture, layout, navigational and functional elements.

### 1.6 Final Deliverables

Final Deliverables means the final versions of Deliverables provided by HIGHOPES and accepted by Client.

### 1.7 Final Works



Final Works means all creative content developed by HIGHOPES, or commissioned by HIGHOPES, exclusively for the Project and incorporated in the Final Deliverables, including, but not limited to, any and all visual elements, graphic design, illustration, photography, animation, motion design, audio-visual works, sounds, typographic treatments and text, modifications to Client Content, and HIGHOPES's selection, arrangement and coordination of such elements together with Client Content and/or Third Party Materials.

### 1.8 Preliminary Works

Preliminary Works means all creative content including, but not limited to, concepts, sketches, visual presentations, or other alternate or preliminary designs and documents developed by HIGHOPES and which may or may not be shown and or delivered to Client for consideration but do not form part of the Final Works.

### 1.9 Project

Project means the scope and purpose of the Client's identified usage of the work product as described in the Proposal.

### 1.10 Services

Services means all services and the work product to be provided to Client by HIGHOPES as described and otherwise further defined in the Proposal.

### 1.11 Third Party Materials

Third Party Materials means proprietary third party materials which are incorporated into the Final Deliverables, including without limitation stock photography or illustration.

### 1.12 Trademarks

Trademarks means trade names, words, symbols, designs, logos or other devices or designs used in the Final Deliverables to designate the origin or source of the goods or services of Client.

### 1.13 Working Files

Working Files means all underlying work product and digital files utilized by HIGHOPES to create the Preliminary Works and Final Works other than the format comprising the Final Deliverables.

## 2 Proposal

The terms of the Proposal shall be effective for seven (7) calendar days after presentation to Client. In the event this Agreement is not executed by Client within the time identified, the Proposal, together with any related terms and conditions and deliverables, may be subject to amendment, change or substitution.

## 3 Fees and Charges



### 3.1 Fees

In consideration of the Services to be performed by HIGHOPES, Client shall pay to HIGHOPES fees in the amounts and according to the payment schedule set forth in the Proposal, and all applicable sales, use or value added taxes, even if calculated or assessed subsequent to the payment schedule.

### 3.2 Expenses

Client shall pay HIGHOPES's expenses incurred in connection with this Agreement as follows: (a) incidental and out-of-pocket expenses including but not limited to costs for postage, shipping, overnight courier, and taxis at cost , and, if applicable, a standard mileage reimbursement at $0.58 per mile; and (b) travel expenses including transportation, meals, and lodging, incurred by HIGHOPES with Client's prior approval.

### 3.3 Additional Costs

The Project pricing includes HIGHOPES's fee only. Any and all outside costs including, but not limited to, equipment rental, photographer's costs and fees, photography and/or artwork licenses, talent fees, music licenses,  and online access or hosting fees, will be billed to Client unless specifically otherwise provided for in the Proposal.

### 3.4 Invoices/Payments

Client shall pay all invoices within 7 calendar days of the invoice date. A monthly service charge of 1.5 percent (or the greatest amount allowed by state law) may be charged on all overdue balances. Payments will be credited first to late payment charges and next to the unpaid balance. Client shall be responsible for all collection or legal fees necessitated by lateness or default in payment. HIGHOPES reserves the right to withhold Deliverables if accounts are not current or overdue invoices are not paid in full. All grants of any license to use or transfer of ownership of any intellectual property rights under this Agreement are conditioned upon receipt of payment in full, including any outstanding Additional Costs, Taxes, Expenses, Fees, Charges, or the cost of Changes.

## 4 Changes

### 4.1 General Changes

Unless otherwise provided in the Proposal, and except as otherwise provided for herein, Client shall pay additional charges for changes requested by Client which are outside the scope of the Services on a time and materials basis, at HIGHOPES's standard hourly rate of $165.00 per hour. Such charges shall be in addition to all other amounts payable under the Proposal, despite any maximum budget, contract price or final price identified therein. HIGHOPES may extend or modify any delivery schedule or deadlines in the Proposal and Deliverables as may be required by such Changes.

### 4.2 Substantive Changes.



If Client requests or instructs Changes that amount to a revision in or near excess of twenty five percent (25%) of the time required to produce the Deliverables, and or the value or scope of the Services, HIGHOPES shall be entitled to submit a new and separate Proposal to Client for written approval. Work shall not begin on the revised services until a fully signed revised Proposal and, if required, any additional retainer fees are received by HIGHOPES.

### 4.3 Timing

HIGHOPES will prioritize performance of the Services as may be necessary or as identified in the Proposal, and will undertake commercially reasonable efforts to perform the Services within the time(s) identified in the Proposal. Client agrees to review Deliverables within the time identified for such reviews and to promptly either (i) approve the Deliverables in writing or (ii) provide written comments sufficient to identify Client's concerns, objections or corrections. HIGHOPES shall be entitled to request written clarification thereof. Client acknowledges and agrees that HIGHOPES's ability to meet schedules is entirely dependent upon Client's prompt performance of its obligations to provide materials and written approvals and/or instructions pursuant to the Proposal and that any delays in Client's performance or Changes in the Services or Deliverables requested by Client may delay delivery of the Deliverables. Any such delay caused by Client shall not constitute a breach of this Agreement by HIGHOPES.

### 4.4 Testing and Acceptance.

Client acknowledges that HIGHOPES has reserved time exclusively to perform the Services. Accordingly, in the event Client causes a delay in the Services ("Client Delay") greater than two weeks, Client shall pay to HIGHOPES, in addition to fees and expenses already incurred through the date of such Client Delay, a Project Restart Fee equal to $300 to be paid before resuming work. Client acknowledges that if HIGHOPES accepts other work because of a Client Delay, HIGHOPES may adjust time to complete the Services as necessary to accommodate such other work.

## 5 Client Responsibilities

Client acknowledges that it shall be responsible for performing the following in a reasonable and timely manner:

(a) coordination of any decision-making with parties other than the HIGHOPES;

(b) provision of Client Content in a form suitable for reproduction or incorporation into the Deliverables without further preparation, unless otherwise expressly provided in the Proposal;

(c) final proofreading and in the event that Client has approved Deliverables but errors, such as, by way of example, not limitation, typographic errors or misspellings, remain in the finished product, Client shall incur the cost of correcting such errors ; and



(d) ensuring that all information and claims comprising Client Content are accurate, legal and conform to applicable standards in Client's industry.

# 6 Attribution/Promotions

Each party acknowledges that in connection with this Agreement it may receive certain confidential or proprietary technical and business information and materials of the other party ("Confidential Information"). Each party, its agents and employees shall hold and maintain in strict confidence all Confidential Information, shall not disclose Confidential Information to any third party, and shall not use any Confidential Information except as may be necessary to perform its obligations under the Project, except as may be required by a court or government authority. Notwithstanding the foregoing, Confidential Information shall not include any information that is in the public domain or becomes publicly known through no fault of the receiving party, or is otherwise properly received from a third party without an obligation of confidentiality.

# 8 Relationship of the Parties

## 8.1 Independent Contractor.

HIGHOPES is an independent contractor, not an employee of Client or any company affiliated with Client. HIGHOPES shall provide the Services under the general direction of Client, but HIGHOPES shall determine, in HIGHOPES's sole discretion, the manner and means by which the Services are accomplished. This Agreement does not create a partnership or joint venture and neither party is authorized to act as agent or bind the other party except as expressly stated in this Agreement. All rights, if any, granted to Client are contractual in nature and are wholly defined by the express written agreement of the parties and the various terms and conditions of this Agreement.

## 8.2 Design Agents.

HIGHOPES shall be permitted to engage and/or use third party designers or other service providers as independent contractors in connection with the Services ("Design Agents"). HIGHOPES shall remain fully responsible for such Design Agents' compliance with the various terms and conditions of this Agreement.

## 8.3 No Solicitation.

The parties expressly acknowledge that this Agreement does not create an exclusive relationship between the parties. Client is free to engage others to perform services of the same or similar nature to those provided by HIGHOPES, and HIGHOPES shall be entitled to offer and provide design services to others, solicit other clients and otherwise advertise the services offered by HIGHOPES.

# 9 Warranties and Representations

## 9.1 By Client.



Client represents, warrants and covenants to HIGHOPES that (a) Client owns all right, title, and interest in, or otherwise has full right and authority to permit the use of the Client Content, (b) to the best of Client's knowledge, the Client Content is accurate, legal, conforms to ethical standards of the Client's industry, does not infringe the rights of any third party, and use of the Client Content as well as any Trademarks in connection with the Project does not and will not violate the rights of any third parties, (c) Client shall comply with the terms and conditions of any licensing agreements which govern the use of Third Party Materials, and (d) Client shall comply with all laws and regulations as they relate to the Services and Deliverables.

### 9.2 By HIGHOPES

(a) HIGHOPES hereby represents, warrants and covenants to Client that HIGHOPES will provide the Services in a professional and workmanlike manner and in accordance with all reasonable professional standards for such services.

### 10.1 By Client.

Client agrees to indemnify, save and hold harmless HIGHOPES from any and all damages, liabilities, costs, losses or expenses arising out of any claim, demand, or action by a third party arising out of any breach of Client's responsibilities or obligations, representations or warranties under this Agreement. Under such circumstances HIGHOPES shall promptly notify Client in writing of any claim or suit; (a) Client has sole control of the defense and all related settlement negotiations; and (b) HIGHOPES provides Client with commercially reasonable assistance, information and authority necessary to perform Client's obligations under this section. Client will reimburse the reasonable out-of-pocket expenses incurred by HIGHOPES in providing such assistance.

### 10.2 By HIGHOPES.

HIGHOPES agrees to indemnify, save and hold harmless Client from any and all damages, liabilities, costs, losses or expenses (collectively "Liabilities") arising out of any meritorious claim, demand, or action by a third party which is inconsistent with HIGHOPES's representations and warranties made herein, except in the event any such Liabilities arise directly as a result of Client's gross negligence or misconduct, provided that (a) Client promptly notifies HIGHOPES in writing of the claim; (b) HIGHOPES shall have sole control of the defense and all related settlement negotiations; and (c) Client shall provide HIGHOPES with the assistance, information and authority necessary to perform HIGHOPES's obligations under this section.

Notwithstanding the foregoing, HIGHOPES shall have no obligation to defend or otherwise indemnify Client for any claim arising out of or due to Client Content, Third Party Materials, modifications of or content added to the Deliverables by Client or third parties, improper or illegal use of Deliverables, use of Deliverables not authorized under this Agreement, or the failure to update or maintain Deliverables.

### 10.3 Settlement Approval.



The indemnifying party may not enter into any settlement agreement without the indemnified party's written consent.

### 10.4 Limitation of Liability.

**The services and the work product of HIGHOPES are provided "as is." In all circumstances, the maximum liability of HIGHOPES, its directors, officers, employees, design agents and affiliates, to Client for damages for any and all causes whatsoever, and Client's maximum remedy, regardless of the form of action, whether in contract, tort or otherwise, shall be limited to the total Project fee of HIGHOPES. In no event shall HIGHOPES be liable for any lost data or content, lost profits, business interruption or for any indirect, incidental, special, consequential, exemplary or punitive damages arising out of or relating to the materials or the services provided by HIGHOPES, even if HIGHOPES has been advised of the possibility of such damages, and notwithstanding the failure of essential purpose of any limited remedy.**

## 11 Term and Termination

### 11.1 Term.

This Agreement shall commence upon the Effective Date and shall remain effective until the Services are completed and delivered, or otherwise terminated as set forth herein.

### 11.2 Termination

This Agreement may be terminated for convenience at any time by either party effective immediately upon notice, or the mutual agreement of the parties, or for cause if any party:

(a) becomes insolvent, files a petition in bankruptcy, makes an assignment for the benefit of its creditors; or

(b) breaches any of its material responsibilities or obligations under this Agreement, which breach is not remedied within ten (10) days from receipt of written notice of such breach.

### 11.3 In the event of termination.

In the event of termination, HIGHOPES shall be compensated for the Services performed through the date of termination in the amount of (a) any advance payment, (b) a prorated portion of the fees due, or (c) hourly fees for work performed by HIGHOPES and/or Design Agents as of the date of termination, whichever is greater; and Client shall pay any outstanding Additional Costs, Taxes, Expenses, Charges, and costs of Changes incurred through the date of termination. In the event of termination for convenience by Client, Client shall pay in addition to the above an early termination fee equal to 25% of the total Project fee, Schedule A shall not be effective, and Client shall not have rights to use the Deliverables except upon written consent from HIGHOPES provided after such termination.

### 11.4 Expiration or termination



In the event of termination for convenience by HIGHOPES or for cause by Client, and upon full payment of compensation as provided herein, HIGHOPES grants to Client such right and title as provided for in Schedule A of this Agreement with respect to those Deliverables provided to, and accepted by Client as of the date of termination.

### 11.5

Upon expiration or termination of this Agreement: (a) each party shall return or, at the disclosing party's request, destroy the Confidential Information of the other party, and (b) other than as provided herein, all rights and obligations of each party under this Agreement, exclusive of the Services, shall survive.

### 11.6 Work Stoppage Option

If HIGHOPES has grounds to terminate this Agreement for breach under Section 11.2(b), HIGHOPES may elect to suspend work until Client cures the breach and agrees to amend the Proposal to adjust fees, including Suspension Fees, and schedules as reasonably required by HIGHOPES.

## 12 General

### 12.1 Modification/Waiver.

This Agreement may be modified by the parties only in writing signed by both parties, except that HIGHOPES's invoices may include, and Client shall pay, Additional Costs, Expenses, Charges, and costs of Changes that Client authorizes by email or a project management platform utilized for the Project. Failure by either party to enforce any right or seek to remedy any breach under this Agreement shall not be construed as a waiver of such rights nor shall a waiver by either party of default in one or more instances be construed as constituting a continuing waiver or as a waiver of any other breach.

### 12.2 Notices.

All notices to be given hereunder shall be transmitted in writing via a project management platform utilized for the Project, e-mail, or certified or registered mail, return receipt requested, to the addresses identified below, unless notification of change of address is given in writing. Notice shall be effective upon receipt or in the case of email, upon confirmation of receipt (by automated confirmation or reply by the recipient).

### 12.3 No Assignment.

Neither party may assign, whether in writing or orally, or encumber its rights or obligations under this Agreement or permit the same to be transferred, assigned or encumbered by operation of law or otherwise, without the prior written consent of the other party, except that this Agreement may be transferred or sold as part of a transfer or sale of the assigning party's entire business or portion thereof relating to the Project.

### 12.4 Force Majeure.



HIGHOPES shall not be deemed in breach of this Agreement if HIGHOPES is unable to complete the Services or any portion thereof by reason of fire, earthquake, flood, hurricane or other severe weather, labor dispute, act of war, terrorism, riot or other severe civil disturbance, death, illness or incapacity of HIGHOPES or any local, state, federal, national or international law, governmental order or regulation or any other event beyond HIGHOPES's control (collectively, "Force Majeure Event"). Upon occurrence of any Force Majeure Event, HIGHOPES shall give notice to Client of its inability to perform or of delay in completing the Services and shall propose revisions to the schedule for completion of the Services.

## 12.5 Governing Law and Dispute Resolution.

The formation, construction, performance and enforcement of this Agreement shall be in accordance with the laws of the United States and the state of Washington without regard to its conflict of law provisions or the conflict of law provisions of any other jurisdiction. In the event of a dispute arising out of this Agreement, the parties agree to attempt to resolve any dispute by negotiation between the parties. If they are unable to resolve the dispute, either party may commence mediation and/or binding arbitration through the American Arbitration Association, or other forum mutually agreed to by the parties. The prevailing party in any dispute resolved by binding arbitration or litigation shall be entitled to recover its attorneys' fees and costs. In all other circumstances, the parties specifically consent to the local, state and federal courts located in the state of Washington. The parties hereby waive any jurisdictional or venue defenses available to them and further consent to service of process by mail. Client acknowledges that HIGHOPES will have no adequate remedy at law in the event Client uses the Deliverables in any way not permitted hereunder, and hereby agrees that HIGHOPES shall be entitled to equitable relief by way of temporary and permanent injunction, and such other and further relief at law or equity as any arbitrator or court of competent jurisdiction may deem just and proper, in addition to any and all other remedies provided for herein.

## 12.6 Severability.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement shall nevertheless remain in full force and effect and the invalid or unenforceable provision shall be replaced by a valid or enforceable provision.

## 12.7 Interpretation.

Section headings are solely for convenience and reference only and shall not affect the scope, meaning, intent or interpretation of the provisions of this Agreement nor otherwise be given any legal effect. Any design terminology shall be defined according to standard design industry usage, and any dispute as to the meaning or scope of design terminology shall be determined by HIGHOPES in good faith. Any other ambiguities shall be resolved with the most reasonable and legally valid construction, without regard to authorship of such provisions.

## 12.8 Integration.



This Agreement comprises the entire understanding of the parties hereto on the subject matter herein contained, and supersedes and merges all prior and contemporaneous agreements, understandings and discussions between the parties relating to the subject matter of this Agreement. In the event of a conflict between the Proposal and any other Agreement documents, the terms of the Proposal shall control. This Agreement comprises this Basic Terms and Conditions document, the Proposal, Schedule A, and Supplement 1.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK — SIGNATURES TO FOLLOW]*

**HIGHOPES**
Grove Bags | January 24, 2022



By their execution below, the parties hereto have agreed to all of the terms and conditions of this Agreement effective as of the last date of signature below, and each signatory represents that it has the full authority to enter into this Agreement and to bind her/his respective party to all of the terms and conditions herein.

**HIGHOPES, LLC**

**CLIENT:**

Grove Bags

Address:

Address:

14241 NE Woodinville Duvall Rd #372

1648 St. Clair Ave

Woodinville, Washington 98072

Cleveland, Ohio 44114

Signed: *Jalen Bosker*
2022-02-08 13:09:44 (PST)

Signed: *Patrick Toste*

Print Name: Jalen Bosker

January 24, 2022

Title: Creative Director

February 08, 2022

**Please email all invoices to:**

Dan Jaffe

dan@grovebags.com



# Schedule A:

INTELLECTUAL PROPERTY PROVISIONS

ASSIGNMENT OF RIGHTS

## IP 1  Rights in the Final Deliverables

### IP 1.1 Final Works

Upon completion of the Services, and expressly conditioned upon full payment of all fees and costs due, HIGHOPES assigns to Client all of HIGHOPES's Copyrights in and to the Final Works, including Trademarks, and HIGHOPES shall deliver to Client all Working Files related to the Final Works. HIGHOPES shall cooperate with Client and shall execute any additional documents reasonably requested by Client to evidence such assignment, and Client shall reimburse HIGHOPES for HIGHOPES's reasonable time and out-of-pocket expenses in connection therewith.

### IP 1.2 Trademarks

Client shall have sole responsibility for ensuring that Trademarks do not infringe the rights of third parties, and Client shall indemnify, save and hold harmless HIGHOPES from any and all damages, liabilities, costs, losses or expenses arising out of any claim, demand, or action by a third party alleging trademark infringement, or arising out of Client's failure to obtain trademark clearance or permissions, for use of Trademarks.

### IP 1.3 Client Content.

Client Content, including pre-existing Trademarks, shall remain the sole property of Client or its respective suppliers, and Client or its suppliers shall be the sole owner of all trademark, trade secrets, patents, Copyrights, and other rights in connection therewith. Client hereby grants to HIGHOPES a nonexclusive, nontransferable license to use, reproduce, modify, display and publish the Client Content solely in connection with HIGHOPES's performance of the Services and promotional uses of the Deliverables as authorized in this Agreement.

### IP 1.4 Third Party Materials.



Intellectual property rights in Third Party Materials shall be owned by the respective third parties. HIGHOPES shall inform Client of all Third Party Materials to be procured by HIGHOPES that Client may need to license at Client's own expense, and unless otherwise arranged by Client, HIGHOPES shall obtain a license for Client to use the Third Party Materials consistent with the usage rights granted herein. Client shall indemnify, save and hold harmless HIGHOPES from any and all damages, liabilities, costs, losses or expenses arising out of any claim, demand, or action by a third party arising out of Client's failure to obtain copyright, trademark, publicity, privacy, defamation or other releases or permissions with respect to materials included in the Final Works at Client's request.

## IP 2 Rights Reserved to HIGHOPES

### IP 2.1 Preliminary Works / Working Files.

HIGHOPES retains all proprietary rights, including property ownership, intellectual property rights and Copyrights, in and to all Preliminary Works and Working Files, and Client shall return to HIGHOPES all Preliminary Works and Working Files in Client's possession within thirty (30) days of completion of the Services.

### IP 2.2 Original Artwork.

HIGHOPES retains property ownership in any physically tangible original artwork comprising Final Works, including all rights to display or sell such artwork. Client shall return all original artwork to HIGHOPES within thirty (30) days of completion of the Services.

### IP 2.3 HIGHOPES Tools.

HIGHOPES Tools and all intellectual property rights therein, including Copyrights, shall be owned solely by HIGHOPES. HIGHOPES hereby grants to Client a nonexclusive, nontransferable (other than the right to sublicense such uses to Client's publisher, Web hosting or Internet service providers), perpetual, worldwide license to use the HIGHOPES Tools solely with the Final Deliverables for the Project. Client may not directly or indirectly, in any form or manner, decompile, reverse engineer, or otherwise disassemble or modify any HIGHOPES Tools comprising software or technology.



# Supplement 1:

## WEBSITE-SPECIFIC TERMS AND CONDITIONS

## W 1  Support Services

### W 1.1 Warranty Period.

"Support Services" means commercially reasonable technical support and assistance to maintain and update the Deliverables, including correcting any errors or Deficiencies, but shall not include the development of enhancements to the Project or other services outside the scope of the Proposal. During the first month following the expiration of this Agreement ("Warranty Period"), HIGHOPES shall provide bug fixes, perform CMS updates, plugin/3rd party updates, and website backups during this period.  Additional time shall be billed at HIGHOPES's regular hourly rate, then in effect upon the date of the request for additional support.

### W 1.2 WebCare Program.

Upon expiration of the Warranty Period and at Client's option, HIGHOPES will provide Support Services on a monthly basis (the "WebCare Program") for a monthly fee beginning at $250. The parties may cancel the WebCare Program at any time.  Cancellation of the WebCare program will be effective at the end of that month's cycle.  HIGHOPES will perform, if applicable, routine CMS updates, plugin/3rd party updates, website backups, ongoing speed optimization, basic website monitoring, and Google Analytics reporting.

## W2 Enhancements

During the Maintenance Period, Client may request that HIGHOPES develop enhancements to the Deliverables, and HIGHOPES shall exercise commercially reasonable efforts to prioritize HIGHOPES's resources to create such enhancements. The parties understand that preexisting obligations to third parties existing on the date of the request for enhancements may delay the immediate execution of any such requested enhancements. Such enhancements shall be provided on a time and materials basis at HIGHOPES's then-in-effect price for such services.

## W3 Additional Warranties and Representations

### W 3.1 Deficiencies.

Subject to the representations and warranties of Client in connection with Client Content, HIGHOPES represents and warrants that the Final Deliverables will be free from Deficiencies. For the purposes of this Agreement, "Deficiency" shall mean a failure to comply with the specifications set forth in the Proposal in any material respect, but shall not include any problems caused by Client Content, modifications,



alterations or changes made to Final Deliverables by Client or any third party after delivery by HIGHOPES, or the interaction of Final Deliverables with third party applications such as Web browsers other than those specified in the Proposal. The parties acknowledge that Client's sole remedy and HIGHOPES's sole liability for a breach of this Section is the obligation of HIGHOPES to correct any Deficiency identified within the Warranty Period. In the event that a Deficiency is caused by Third Party Materials provided or specified by HIGHOPES, HIGHOPES's sole obligation shall be to substitute alternative Third Party Materials.

**W 3.2 HIGHOPES Tools.**

Subject to the representations and warranties of the Client in connection with the materials supplied by Client, HIGHOPES represents and warrants that, to the best of HIGHOPES's knowledge, the HIGHOPES Tools do not knowingly infringe the rights of any third party, and use of same in connection with the Project will not knowingly violate the rights of any third parties except to the extent that such violations are caused by Client Content, or the modification of, or use of the Deliverables in combination with materials or equipment outside the scope of the applicable specifications, by Client or third parties.

## W4 Compliance with Laws

HIGHOPES shall use commercially reasonable efforts to ensure that all Final Deliverables shall be designed to comply with relevant rules and regulations known to HIGHOPES; however, Client, upon acceptance of the Deliverables, shall be solely responsible for conformance with all rules, regulations, and laws relating to Client's use thereof, including without limitation, relating to the transfer of software and technology, and compliance with the Americans with Disabilities Act and Section 508 of the Workforce Investment Act.

